Good afternoon. It's my pleasure to welcome you to the Browning Courthouse here in San Francisco. This is the time set for oral argument for rehearing en banc in the case of Paul Parker v. BNSF Railway Company. Council is ready to proceed. You may come forward. May it please the court. My name is Bill Jungbauer. I represent Mr. Parker, the personal representative of Mr. Rueckert, who is the deceased conductor, who is a subject matter of this case. I would request that I be allowed to reserve ten minutes for rebuttal, please. Everyone agrees in this case that 42121B2B, Roman numeral 4, is the, governs the affirmative defense, proof that a defendant must prove with clear and convincing evidence in order to succeed once the plaintiff has proved its substantive case. The problem in this case is that the district court did not follow the 42121B2B, Roman numeral 4. If we look at the panel's decision at page 701, the court outlines exactly what the problem is here. The court says the proper inquiry, however, is not whether the protected activity contributed very little to the firing. The proper inquiry is whether BNSF would have fired Rueckert regardless of whether he had conducted an airbrake test. That is the issue. So, as the court goes on further at the bottom of the page, it says because we have not had much occasion to interpret what clear and convincing evidence an employer would need to provide to meet its affirmative defense burden under the FRSA, we look to other sources. And in doing so, the court does come up with, the panel does come up with a number of factors that have been recognized not only by courts, but even by OSHA. Counsel, what is our standard of review of the district court's factual finding that absent the air test, BNSF would still have fired Mr. Rueckert? I believe it's de novo because that is a mixed question of law and fact. If we look at the analysis that the court did, the court correctly cites the 42121B2B Roman numeral IV, but then it doesn't go on to prove it. And so when the court says, in fact, if we go to the, if we go to 1ER19 and 20, you will see exactly how the court describes what it did. On 1ER20, the first line one, the court says he was fired for gross dishonesty. That's not accurate. And insubordination. And insubordination. That is not accurate. And, in fact, Your Honor, even if we were to take the clear error test, if you look at the evidence, the undisputed evidence in the record, it shows that if we look at the dismissal letter, which is at 898, 6ER898, it's, you will see that Mr. Rueckert was not fired for either insubordination or for gross dishonesty. And that becomes real, and the court made findings to that effect. Now, if you look at that, I don't know if you can pull that up on your screens, but it cites, as a result of the investigation, and it goes on to say, you're dismissed immediately for your failure to work efficiently during your hour of duty, dishonesty when recording off-duty time, failure to provide an assigned FRA tie-up time slip, and failure to comply with instructions at 19.50 and another time. It does not ever use the term insubordination. It does not ever use the term gross dishonesty. And I would ask the Court to look at the Tenth Circuit case of Fresquez v. BNSF, because they dealt with the exact same terms. What they said there, the Court, in doing its analysis, said, oh, BNSF sometimes charges employees with failure to comply with instructions, which is what they did here to Mr. Rookert. That's what they charged him with in the charging letter, and that's what they found in dismissing him. That's a business record. Those are admissions. Those are not subject to the court interpreting the demeanor of a witness. What happened is they changed. These are shifting explanations that were done long after the original firing, long after the first trial. So they come to the second trial, and they do the shifting explanation, and they say, oh, we're going to call this gross dishonesty, and we're going to call it insubordination. If you look at the Fresquez case, it also says you've got to define what insubordination is. Think about it. If you look in the PEPA policy, which is BNSF's supposed ‑‑ it's their policy, progressive discipline is what they call it. This isn't progressive discipline. The guy goes to lunch, and they fire him. Look at the other ‑‑ Counsel, I apologize for interrupting you. When you said that the guy goes to lunch, and they fire him, wasn't it more than that, though? It wasn't that he just went to lunch, but didn't he, like, put on his timesheet that he hadn't gone to lunch, he got paid, and he was actually paid, correct? Not for that time. And that is a huge point, Your Honor, and it's in the record. As it turns out, employees such as Mr. Rooker, when they go to work, they get paid for eight hours whether they work eight hours or not. He was about five and a half hours into his trip. So he gets called back to get yelled at by his boss, and the boss says, you're going to ‑‑ we want you to ‑‑ you shouldn't have done this error test, so tie up. And then the question is, Mr. Gordon says he told all three employees to tie up and go home at 19.50, and that will become something. But as far as getting paid, no, they don't get paid for that. There's no money made. Also, if you ‑‑ I would point out to the court that there is, at 6ER 982, is the citation to the rule for BNSF that tells employees, if you're going to stick around and eat lunch, you've got to reflect on your time card the time that you were eating lunch. Here's a guy completing with that. He does all that, and then they pull him, and then he comes up with these pretext, and that's all it is, pretext answers to say we're going to fire him. If you look at the key items here, you know, the meals I think we just talked about, the dismissal letter, which is at 898, they didn't fire him for insubordination and gross dishonesty. And you know why that's important? Because in the PEPA policy, this progressive policy, part C, page C of the appendix says single event terminations may, and that's a very important word, by the way, may, not shall, not will, you may terminate someone for these, which means when the court says, oh, the district court says, Mr. Rooker was fired pursuant to the PEPA policy, the PEPA policy doesn't mandate termination. The PEPA policy language itself, if you look at it, it doesn't prove anything other than they could do something to him. Mr. Younggar, have we ever held that the correct standard of review for this kind of pretext is a mixed question of fact and law? It seems like even the pretext that you're asserting here would also be a district court fact-finding role that is subject to clear error review. The — the — the — because 42121B2B4 sets out exactly what must be proved with clear and convincing evidence, there have been a number of courts, this Court, I believe in Frost, and a number of other courts have said that you should look at different factors, but what would be really nice, and it's great that you have a whole panel hearing this, because not only this circuit, but all the circuits and all the courts, and even OSHA, need guidance as to what, how to apply the affirmative defense. The best guidance that exists today is the OSHA manual, which was cited both by the defendant and by us, the OSHA's — OSHA's whistleblower manual. And it tells non-lawyers how to do the testing, the Respondent's defense, their affirmative defense. And it goes through all the pretext testing that they say is mandatory. And this Court did not do any of the mandatory items that are suggested by OSHA, and that's at page 32 and 33 of that manual that's cited. And I'd ask the Court to look at that and consider that in — when you make your decision as to what should be considered. One of the things, for instance, is comparators. What are the proofs, when you think about — when we get down to the brass tacks here, if a railroad has to prove something with clear and convincing evidence, what's the proof? Is it just some officials coming by saying, well, we would have fired them, or is it much more reliable to have comparators? BNSF has comparators. They try — Sotomayor, why isn't it an appropriate comparison that the other two people involved in the air brake test were not fired, and they did not do these additional rule violations that Mr. Rooker did? Why isn't that — why doesn't that allow a strong inference that this was not the cause of his firing? Judge Graber, the reason for that is the plain language of the statute itself. Now, I'm asking you about the facts. I'm asking you about inferences from facts. I'm not asking you about the statute. You said there need to be comparators. Why aren't those the most important comparators? Because they're not — they were — They participated in the test, and they were not fired, and they did not violate other rules. But the problem with that, Your Honor, is that that question has the protected activity built into it. And as the district — as the panel said, we don't know whether that influenced or whether there was protection. But the panel's opinion has been vacated. Yes, it has. What is your argument? My argument is, if you follow the — if you read the whole transcript, Mr. Jones goes downstairs for a break and tells those two guys, don't worry, we're going to take care of you. It's in the record for the testimony of Webb and Bellinger. There's more going on here. They wanted to get Rooker to set an example. And, by the way, the key thing here, one of the things we look at bias, how come the Court never dealt with the smoking gun? How often do you get a smoking gun in a case like this? Well, the smoking gun — Counsel, I think I know what you're going to argue. I think you're going to argue that the investigator himself found, said, there are other crews that are doing this. Let's make an example of this one. He acknowledged, the company acknowledged, that other crews were so-called slow-walking. But what I want you to explain to me is, how did this notion that Mr. Ricard opposed the changes to the schedule and the way in which the train was accommodating its customers, how did that play into this? Because, to me, this sounds like a retaliation case for the opposition to the new — the changes that the railroad had instituted. I'm not sure that's even argued here. But how does that play into the protected activity? It's actually the opposite. It does. And the reason for it is this. The railroad was arguing, oh, Mr. Ricard was against, they claim, the shift in location. What he said is, the changes aren't going to save you all the time you save. When he said it couldn't be done in 12 hours, he didn't say, I'm going to work slow and do it in 12 hours. In fact, if we look at the records, Mr. Ricard got his work done all those times in 12 or less hours. Mr. Creek, the other guy, he was working over the hours limits. He worked 13 hours one of those weeks. And they still weren't getting it done. And if you also look at the record, there were no complaints about Ricard or his crew and how they were doing their job. None. Finally, when we talk about the air test and the fact that a lot of other air tests were done, the protected activity here was not air test. The protected activity here was refusing to stop doing a safety air test. The other air tests on earlier weeks had nothing to do with that because the company didn't call them up and say, why are you doing this test? I don't think you need to do that test. The other thing I find kind of troubling, and this is for both sides, about the district court's order is it seems contradictory to me because he makes a finding that the refusal to come home and not finish the air test was a part of the reason for the firing. And then he says he would have been fired anyway. And to me, that seems kind of inherently a conflict because, well, for me, it's hard to unwind the events of the day from each other. Like the whole thing seemed to be one incident, not, you know, broken up the way it's broken up here. But why aren't the findings, why aren't you making the argument that the findings that the district court made are inherently contradictory? You can't say it's a part and then say it's not a part. In fact, if you look, we had two parts to our appeal. We gave the district court, we asked the district court to please allow us to have a hearing on amending its order. And facts, I wanted to have a hearing with the district judge where I could go in there and go fact by fact, not everything but all the key ones, and we were denied. We never got to have that. Counsel, why isn't the issue that Judge Wardlaw has raised inherently part of the affirmative defense? In other words, it doesn't even arise for the employer to demonstrate that they would have fired the person anyway unless there's first a prima facie case that a protected activity was part of the mix. If it wasn't even part of the mix, you'd never get to the affirmative defense. So why isn't that just baked into the statute that you have? Well, it is. It is. It is. Okay. Because what 42121B2B3, Roman numeral III says, for your substantive case, you have to prove by a preponderance of the evidence that there was protected activity and that it contributed. So that is baked in.  And that's when the affirmative defense arises, so that even if a person proves that it was a contributing factor, the employer has the opportunity by clear and convincing evidence to convince the finder of fact that the person would have been fired anyway. In other words, if a person engages in protected activity and then they shoot somebody, you can still fire them for shooting somebody. I've got an example for you, because, Judge Graber, you had an example in your other opinion. I was thinking about that. And here's how it works. If the — what the 42121B2B4 says is two things that are really important. They have to prove — the key words are would. They have to prove it clear and convincing that they would have fired them. And they've got to prove in the absence of protected activity. Absence. That is the key. So going back to one of the earlier questions. So if it contributed very little and somebody, you know, kills a coworker, then presumably they've proved it, right? It's just a matter of how convincing the evidence is. And here's — let me give you the example. And yours is close. I could use yours. So let's say that Mr. Rookert out there is working and he's got a protected activity and he shoots Mr. Gordon because he ticked off at him on the job, in the office. And you're saying, well, is this protected activity going to be a shield where the railroad can't get him? No. And the reason is because all they have to do is prove that in the absence of the protected activity, if you go on the job and shoot Mr. Gordon, we're going to fire you. Same thing if you go to work drunk and you run a red signal and you cause a collision and you turn in an accident report. The accident report does not give you protection from being fired. That's why the key analysis here is in the absence of. So looking at Webb and Bellinger doesn't prove anything because those cases have protected activity tied in with them. More importantly, the comparators that we had, that we came up with — BNSF sends me 20,000 items. I've got to go through them by hand because they locked them up and I couldn't do searches. Long story short, we found a number and the court allowed us to have 12. And if you were to look at some of them, and they're at 6ER887-9, you will find a couple of them there that are identical to this. Someone that did worse, not only failed to sign a timesheet, but stole money from the railroad doing it. Rooker did not get any extra money. But this guy did and they didn't fire him. How do you prove that you would have done something when you let somebody not get fired who actually took money by doing it? But in none of those — the examples that you've given, you're lacking the fact — the employee doesn't have a claim to begin with. And I think as Judge Graber has suggested, we've got — it has to be a contributing factor, right? There has to already be a causal link between the protected activity and the adverse action. That's baked into the employee's claim to begin with. All of these other examples are ones where the employee wouldn't have a claim with because there's no causal link at all. The affirmative defense is premised on the idea that there's a contributing factor. They are separate and distinct analyses with separate and distinct burdens of proof. The first — So what's an example where the adverse action, where the protected activity was a contributing factor, but was not — but where the affirmative defense would apply? Where they show by comparators, for instance, if he had taken — if he had cheated to get money, and you'll find some of them, comparators in there, where somebody had actually listed, not once, but about four times, listed trying to get money and did get money. Theft. That, to me, would be one where they could say, theft independent, we could fire you for it, whether you've got a protected activity or not. It's the — it's the — you have to do the analysis of what would happen in the absence of protected activity. That's why comparators are so important. It's also a reason why — and, Judge Graber, one of your cases said you don't have to have comparators in all situations. I think that was Dugan. But that's a different case. And the gist is, if they've got comparators, they ought to disclose them. If we were in a case where we had a jury and they didn't disclose them, I would ask for a failure to produce available evidence that's exclusively in your control, and I'd get an adverse inference. Because they control all the cards. They've got it all. And you know what's really terrible? I'm in the — the reason I wanted to come and argue this today is I'm in the trenches all the time on this stuff. And when I'm trying to get discovery from district courts and I want to get comparators, they fight us to death on it. They say, oh, it's not relevant, blah, blah, blah. That's the most relevant evidence there is for their affirmative defense. They should be disclosing it in their initial disclosures, but they don't. Did they demonstrate that they actually fired anybody who — for inefficiency and dishonesty? Not — Anybody other than your client? Not without other protected — not protected. Not without other activities. The three examples they gave were — all had individuals that had also violated a very important rule the company has on secrecy. Don't disclose confidential information, which they've fired people for also. So that doesn't prove anything because it's got the protected — it's got, in the absence of protected activity, has to be one of the issues. But it's not a similarly situated individual. You don't have to show — I'm sorry, Your Honor, I'm excited. No. For the affirmative defense, just looking at the affirmative defense without looking at the protected activity, did they come up and show they would have fired — they did, in fact, fire anybody else for clocking out 25 minutes before the — they said that on their timesheet. Not on — not on its own. And, in fact, they could have done searches. And whose burden is it to come forward with this evidence that they would, in fact, fire people for those offenses? It's what they have to do. Right. It's their burden. That's their burden. That's the burden of production. Right. Well, actually, it's the burden of proof under the affirmative defense. Well, that's a subpart of it, isn't it? Well, yeah. That's the initial part. Okay. You're right. I'm sorry, I'm just — Did they come forward with any one of the grounds in the dismissal letter, not the made-up grounds later, but the grounds in the dismissal letter? Did they come forward with evidence that they fired people for — on those grounds? No. Not — not in and of itself. And that's my point. I wanted to do a computer search, which they could do to prove it, one way or the other. And it's not just that, Your Honor. When we go back to what the difference — the different items are that should be in this affirmative defense, comparators are great if you can get them, if they're similarly situated. If you can't get comparators, look at the — at the policy itself. That's the second thing every — not only OSHA, but the cases say. And the policy does not mandate firing someone. And one — Did you want to reserve the balance of your time? Thank you, Your Honor. Good afternoon, Your Honors. My name is David Morell on behalf of BNSF Railway Company. I'd like to begin where the panel dissent began. This is an easy appeal that warrants a short memorandum disposition affirming the district court. The framework for adjudicating claims under the Federal Railroad Safety Act is straightforward. Once the plaintiff establishes that protected activity was a contributing factor in some adverse action, he's proven his case and the burden shifts to the employer to prove that it would have taken the same adverse action even absent the protected activity. All right. So what was the evidence of that that the railroad put forward? Sorry, what was the — That it would. And I'm looking at the factors in the Seventh Circuit's case, Brazil, and it says how clear and convincing the independent significance of a nonprotected activity, the evidence that proves or disproves whether the employer would have taken the same adverse action, and the facts that would change in the absence of the protected activity. But I'm focused on two, the evidence that proves or disproves whether the employer would have, and it's would have, not could have as a technicality, but would have, which means and has and did, in fact, fire people on the grounds listed in the dismissal letter. Right. So, Your Honor, a few responses. What was the evidence before Judge Jones? So there was a lot of evidence. No, I want evidence that your client fired people on those same grounds. So Exhibit 637 was compared — Well, tell me in English without the numbers. I don't have my screen. Sure. So there was evidence submitted in, again, that exhibit, of three individuals who engaged in dishonesty associated with tie-up conduct. Those comparators did not even have the insubordination count. They just had dishonesty with a connection to the tie-up procedures, which is exactly one of the forms of misconduct that BNSF relied upon here. When did those occur? In 2012. Was that before or after Mr. Rueckert's discharge? It was after. So his discharge was in 2010. I will note that Mr. Rueckert doesn't have any problem with comparator evidence coming after later because his own comparator evidence that he submitted, there was 12 individuals that, I don't know if all of them came after, but several came many years later. So I don't think the timing is ever— Well, the question is not whether he has a problem with it. The question is whether this district court judge committed clear error by finding that the railroad met its burden by clearing convincing evidence. I agree that that is the question. I agree the standard of review is clear error. So now is post-firing Mr. Rueckert evidence legally relevant? It is because it demonstrates, it's probative of what the company does when it's confronted with certain types of misconduct. That's why Mr. Rueckert, when he submitted comparator evidence, identified comparators before and after. It's why BNSF did. But I would also say it wasn't just comparator evidence that BNSF submitted at trial. There was a whole host of testimony about why, not just that he committed rule violations. I just want to make sure I have that. So you have evidence of termination of two people?  Three? Three individuals. Three people for dishonesty related to the tie-in procedure? Yes. Okay. That occurred two years later? Correct, 2012. Nothing prior? There was none. I don't believe there was any comparator evidence submitted before. And I'll also note that Mr. Jungbauer extensively cross-examined a company witness about these comparators. I'll note that they were from the same craft and division, which is very significant. Courts typically regard comparators as more probative, where it comes from the same craft, same division. Unlike Mr. Rooker's comparators, these are all from the same craft and division. And, again, they were related to the dishonesty. And I'll also note— That's the only conduct for which they were discharged in all three cases? That's correct, Your Honor. One instance of dishonesty with respect to a tie-up form, that was their only misconduct, and they were discharged. I believe that's correct. The record is clear about this? What's that? And the record is clear about this with all three? Yes, I believe it is clear. What I want to clarify is that they didn't have insubordination. So the particular, as occurred here, the dismissal letters tend to have more factual narrative. They describe, it's not just a bunch of rule violations, but, you know, you did X, Y, and Z. And so there's inherently going to be, you know, some kind of different articulation of what the factual conduct was. But the factual conduct in these three examples related to dishonesty in connection with tie-up procedures. Can I ask you a question as to the other two comparators? That is, the people who were working with him that night? Just to clear up something in my mind. He was the conductor, and they were what? I believe the brakeman and the engineer. Now, do they report to him in some way? Has he considered the leader of the group or the supervisor of the group? I don't believe they report to him, but he would be responsible for the mission or whatever the task was. He was in charge of the particular shift. So he is differently situated than them on this very same protected activity. Not in any relevant respect. Well, he was the one who called the shots on going forward with the safety check after the person back at the headquarters or whatever told him to stop, right? So I don't know if the record is clear on that, but he was certainly ahead of the crew that was conducting this mission. But I think what's important is the salient distinction here for purposes of the affirmative defense, because remember, we're not disputing the contributing factor. We litigated it. No, no, no. I'm talking about the comparators. Right, but what the company would have done in the face of non-protected misconduct, this is relevant to. So I promise you that if the other two individuals on the crew had not engaged in misconduct but were still fired, Mr. Jungbauer would be up here telling you that that's a highly relevant fact that undercuts our affirmative defense. Because the fact that two individuals engaged in the same protected activity but not the misconduct and were treated differently suggests, as the Fifth Circuit has held. They were being instructed by the conductor, so they can't be. I mean, they couldn't say we're stopping and you continue on your own. They were working together under his sort of leadership. And so they're kind of less culpable than he is, and that's why I don't see them as the best comparators. Your Honor, your points? I'm going to look at your evidence of the other three more carefully. Can I ask you a question? I just want to make sure I'm clear because I thought that BNSF, the three comparators offered by BNSF, were fired for falsifying tie-up slips and insubordination. No, Your Honor. I can check, but I'm certain that there's no reference to insubordination. You can give the exhibit numbers if you want. Everybody else has screens, so I don't mean to stop you from doing that. It's Exhibit 637. It's they were not. You have the ER site for that. So I know the testimony around it was 6ER810-14. But one thing I do want to make clear, though, is comparator evidence is obviously a form of evidence that can be probative, but this Court has already held that it's not essential in order for an employer to carry the affirmative defense. There's other factors that Dugan, for example, has said are relevant, and those are particularly, I think, robustly presented in this case. Counsel, part of my struggle with your showing here is that the record shows that the BNSF uses a progressive discipline policy. I can't remember which representative of the company testified that they would not have fired Mr. Rueckert for inefficiency alone because he had no prior discipline for inefficiency, so it wouldn't have comported with progressive discipline. They also didn't actually charge him with gross dishonesty, and they didn't actually charge him with insubordination. Although there were concerns about the exchange he had with his coworker in the break room, they did not actually call that person to testify in his discharge hearing, so they never relied on the content or alleged content of that conversation as a grounds for discharge. So what we're left with is three relatively, arguably, offenses that would have warranted lower progressive discipline than discharge, and I don't see evidence in the record that even this combination of inefficiency and the tie-up, which didn't result in any pay differential and the refusal to leave immediately versus go to the break room, would constitute grounds for discharge under the progressive discipline policy. So, Your Honor, there was a lot of testimony of that. Let me start where you began. You talked about he wasn't charged with certain conduct. I think this is really important to understand. The whole disciplinary process is governed by a CBA between BNSF and the labor force. Part of that, and there's testimony on this, that they don't, you know, charging maybe carries connotations of some criminal-like procedure. We have an indictment with U.S. Code sites. That's not what's going on. What they do in these notices is they identify a factual transaction that puts the employee on notice of what will be investigated. Mr. Jones testified at trial that it's at the hearing itself where they identify and present testimony on which rules are implicated by the conduct and whether the conduct violates those rules. And so there's an issue. Here in the record, does it show that the company made a decision that that conduct equaled gross dishonesty specifically? So, specifically, I will give you gross dishonesty. The policy is at 6 ER 9. The policy, but you said that there was a finding at his discharge hearing that his conduct constituted gross dishonesty. Sure. Where is that? Sir, it's 9 ER 1557 and 1561. It's Mr. Hurlburt who testified that they regarded his TIA procedures as a form of gross dishonesty within the meaning of these policies. And what about the insubordination? Can I give one more site? 3 ER 361 to 362, Mr. Ringstadt, who also gave testimony to that effect. Now, insubordination, so at 9 ER 1562, 3 ER 362 through 63, and 4 ER 540 through 41. And then there's, I can give more, 4 ER 513. 513? Yes. It's Mr. Jones. And then also 4 ER 535. And I don't want to suggest that that's exhaustive, but those I think are some of the clearest examples of the testimony to this effect. And so what you have here, and again, I think what shouldn't be lost is comparator testimony, this Court has already said is not essential, and other courts have held that as well. What courts also consider, which I think is what the district court relied upon, is the strength of the evidence of the misconduct. What is the company's case that there was actually non-protected conduct? And one thing I'll note is the ultimate question, right, I think everybody agrees, reviewed for clear air, what the company would have done, but there's subsidiary findings that Mr. Jungbauer never challenges, right? He never says some particular finding. What he has argued is essentially a jury argument that the court, sitting as the fact finder in the bench trial, should have credited his version of the events. Well, I think that may be because he is arguing for de novo review. I agree, Your Honor, and there's no warrant or precedent for that. I think we all agree it sounds like it is a factual determination reviewed for clear air. And so I think what's important is Mr. Jungbauer had a four-day trial, bench trial. He stipulated to it. He had the chance to make all of the arguments, to weigh the various considerations. You heard today his account of the story. The district court heard the same account. It heard BNSF's. And, yes, there's testimony going in both directions, right? So I don't think we're disputing that he has a version of events. But we have our version of events, and the fact finder, who is entitled to deference in his role as the fact finder, found otherwise. He credited testimony that the company really cared about the dishonesty. And the reason it cared about the dishonesty wasn't because it was some ticky-tack rule violation. It was because the tie-up procedures relate to the FRA hours of service obligations. There's testimony that the company and the employee can be fined if those tie-up numbers or times are incorrect. And, again, that is evidence that the district court had in front and was entitled to rely upon in reaching the conclusion that, no, this wasn't pretext. This wasn't something that the company was, you know, lackadaisical about. They are obligated by federal law to maintain accurate records in order to ensure hours of service limitations are conformed to. And those are findings that the district court made. It wasn't that he just said, oh, ticky-tack rule violation, you know, game over. He specifically, it's around, I think, paragraph 27 of his findings at the end, said the company really cared about this because of the exposure that, or the risk of exposure it created for both the employees and the company itself. And that's something, again, that Mr. Jungbauer has never said. There's no evidence supporting that. And then, similarly, on insubordination, there was evidence, Mr. Jones testified, that they really cared about the message that it sent when you have to tell an employee to leave three times before the individual complies. The counsel, it doesn't matter how much they really cared. It's, you know, did they fire people on that basis? And with the demonstrating that they would have fired him solely on the basis of the dishonesty related to the tie-up. It is relevant to what they would have done is if you show that not only did he violate the rule. If they've never done it and they don't have clear rules saying that that's what they do, how do you meet your burden with clearing convincing evidence? Again, Your Honor, this court has already held that you don't need comparator evidence. Second, we have submitted comparator evidence. Okay, but you don't have, you need to have something that substitutes for it, not just that you really, really cared. But, Your Honor, I think it gets to the point, it's probative because it's one thing to say technical rule violation, we would have fired him. Yes, not as convincing to fact finders. But what is convincing is when you explain not only that there was a violation, but why the violation mattered to the company. That is probative of its motivation and the incentive it had to take action to discipline particular conduct. And there was a, the district court made a specific finding about that, that no one has ever challenged is lacking substantial evidence. And there was also evidence in front of the court about why the insubordination mattered. Now, as for the comparators, again, there's a good reason why courts don't hold that it's essential, and it's because what if the facts are one of a kind? It can't be the case that federal whistleblower law becomes a shield against disciplining novel misconduct. And so, again, there's always going to be some daylight between the particulars of the case before the court and comparators. But what matters is that at least that there's some evidence, again, that can come on all shapes and sizes and forms of what the company would have done. And here there was comparator evidence. And there, in the comparator evidence that BNSF submitted, there wasn't even an insubordination finding as a part of that discipline. And so what you have is essentially half of the misconduct that was at issue here. Because, again, what the district court relied on was insubordination and dishonesty. And in the comparator examples that, and again, 637. I think the district court also found, as a fact, that not all of the inefficiency that was charged related to protected conduct because only 20 to 40 minutes had been involved in the error break test, whereas the inefficiency lasted for, I've forgotten the fact right now, five and a half hours. So that was added into the mix of the district court's findings as well. At least that's how I remember it. Yeah, you're correct, Honor. They were on the shift for about five and a half hours. And there was a finding that the error test only related to about 20 to 40 minutes. And there was testimony. Mr. Jones testified that he was asked if you held everything constant, which is what Murray says you do, the Supreme Court's decision in Murray, says you hold everything constant and you change one fact at a time. So take out the error test. And Mr. Jones testified that, and he was the decision maker, this is at 5 ER 582, he said if you change everything or, sorry, keep everything constant except the error test, he would have taken the same action. And then Mr. Gordon at 5 ER 609 and 615 testified he wouldn't even have sought discipline for the anything related to the inefficiency, the error test, had the additional conduct back at the headquarters not occurred. And then also Mr. Jones at 5 ER 588 testified that he didn't act because of the error test. And at 5 ER 542, he also testified that he would not have disciplined or would not have dismissed Mr. Rueckert based on the inefficiency charge alone. And I think what this all illustrates is that there is a lot of evidence speaking expressly to the ultimate question of what the company would have done absent the error test. And I understand that Mr. Rueckert has a different take on the record, but he has never in his opening brief, his reply or his opposition to the petition for rehearing on Bonk, has said this particular finding has no basis in the record. What he's challenged is whether the district court's findings support the ultimate conclusion of what BNSF would have done absent the protected activity. And that is a quintessential determination for the fact finder. And based on a very well trodden path of how fact finders make these determinations, there's a lot of evidence that makes this a very straightforward case. And again, other factors that Dugan, for example, has said are relevant is the strength of the evidence of the misconduct. And then also, and this is significant, is the incentive, the existence and strength of the motive to retaliate. And so that's another very well established factor in the affirmative defense. And the district court made specific findings about the existence and strength of the motive to retaliate against the protected activity, and that goes to Judge Graber's point that, yeah, the error test was 20 to 40 minutes of a five-and-a-half-hour transaction that BNSF thought was too slow. And there's evidence that Mr. Fort, for example, testified. He said his concern was the overall pace of the work, and that's at 7 ER 1091, 1100, 1110. And Mr. Jones testified at 4 ER 506, 530 to 31, 579, that the delays in other movements was the crux of the issue, not the error test. And so, again, there's a lot of four-day trial. There's a lot of evidence there that both parties submitted. You know, they joined the issue. There's evidence pointing in different directions. But that is all the fodder for a decision maker. And this court's role is to review that for clear error, and there is no grounds to conclude that each of the findings in the district court somehow lacked evidence, and it hasn't been argued here. And so then the question is, do those findings support the ultimate conclusion? And they clearly do. For the reasons I said, there's multiple factors. No circuit court has limited what courts can consider or the fact-finders can consider in making this determination, because it's a counterfactual, right? It's something that the statute necessarily answers or requires the fact-finder to answer a counterfactual. And so what that means is everything is relevant. And so courts have not put guardrails around, you know, how fact-finders go about making that determination. And here you have a very strong case of misconduct, and not just that he violated the rules, but why the company cared. I think that is very significant, that the company does not just have rules that it enforces and spends, you know, devotes the resources to conduct a 12-hour hearing just to kind of catch people. No, all the rules serve a purpose, and the district court here tied the two things together and said rule violation and why it matters. And I think that's what gets this case from the, you know, on the bubble to, you know, comfortably within the discretion of the fact-finder. The other thing is the absence or the existence and strength of a motive to retaliate. And, again, the district court went through that and explained why, yes, the error test was a contributing factor, but here let's put it in context and see whether or not the company really had the incentive to retaliate based on that error test and made specific findings, again, none of which are challenged. And so for those reasons, I guess what I said at the beginning, I think really holds that this is a straightforward case. It's a harder case maybe if you're the fact-finder and you have to weigh, you know, four days of testimony and decide how it all cashes out. But this court's job is much more straightforward because of the standard of review. The question is, is the district court's reading of the record illogical, incoherent, confused? No, it's not. There's testimony going in both directions. The judge was entitled to credit one testimony, one person's testimony over another's. He made credibility determinations that were very important because he could observe the demeanor of the witnesses. Some of the witnesses were, it was their prior testimony because they weren't available, but there were many live witnesses there, and he made findings based on that, those credibility determinations. A couple questions are things I wanted to also address in Mr. Jungbauer's presentation. He talked about Fresquez, that decision. I just want to make clear the procedural context was a jury trial that the Tenth Circuit affirmed from BNSF's appeal. So again, that whatever testimony... The jury in that case found for the plaintiff. Correct. So presumably here, if the district court had found for the plaintiff, you'd have a tough time, right? Right, because it's a clear and convincing, a clear error review of that. Yes, Your Honor. A clear error is hard for whoever the appellant is, and as it should be. This case has been going on since 2014, and there's still not a resolution. And I think, again, there's enough here to say, you know what, the district court did what the law requires, made factual findings, drew inferences from the testimony, credited some, didn't credit others, and ultimately made a determination that rests at the heart of the fact finder's discretion. I just want to see if there's... I think it's also important, too, just on the comparator point, that at page 10 of Mr. Jungbauer's opposition brief to the rehearing petition, he admitted that comparator evidence isn't required. And to my knowledge, no court has ever said it's required. And, again, I think that's a rule for good reasons, or that it's not a rule for good reasons, and precisely because there's always got to be a first for every form of misconduct, every set of facts are going to be a little bit different. And so courts have sensibly said, yes, it can be probative, and if you lack comparator testimony or evidence, your case may be more difficult to prove, depending on how the other factors... what kind of evidence you have on the other factors, but it's certainly not something that's required. But even if it were required, there's also testimony that I think is important that... Let me find it. 6 ER 849, that there was testimony that suggests that Mr. Ringstad, who was a BNSF employee, testified that of the comparators that were on the record, so you take BNSF's, that we talked about the three, and then the ones that Mr. Jungbauer submitted, there's testimony that BNSF's comparators were more comparable, more similarly situated to Mr. Rueckert. And so that's, I think, another point. The other important fact is that Mr. Rueckert's comparators also accepted responsibility by waiving an investigation, and there was testimony that that can result in leniency. And so the non-discipline of other employees when they've accepted responsibility didn't go through the investigation is itself a reason why they might not have been disciplined as severely. And that's at 6 ER 820, 84 to 86, sorry, 845 to 46, and also page 847. Can I ask you one more question about the company's comparators? Does the record show what their prior disciplinary history was? I believe it does. I believe it does, and I believe they didn't have prior discipline, but I'm not certain of that. I can grab the site, the ER site, because I know the exhibit number, but I'll have to look, Your Honor. I'm not sure. Unless the Court has any further questions, thank you for your time. Going in reverse from what counsel just said, he said that some of our comparators were offered waivers, and that maybe they got better treatment for that if they admit their fault. If you look at 6 ER 902, page 902 is the letter that goes to the charging letter that went to all three of the employees. They were all specifically told they were not eligible for a waiver. The company just said, no, we're not going to give you the chance. There goes that argument, because they didn't even give them the chance. When counsel says, oh, well, what about first misconduct? If the company really cares about honesty and all this stuff, if the company really cares, and if justice is what we're all looking for in what we do, why not tell the employees clearly in the rules, if you do A, B, C, or D, you're going to get fired. Define insubordination. Define failure to comply with instructions. Tell us that if you go eat lunch even though you're not going to get paid for it, that we're going to fire you. There's no way these employees were warned of that. Is that justice? Now, the motive to retaliate. Counsel said that the district court made a real clear, really looked into motive to retaliate. What about the smoke and gun email? There is no better proof of a motive to retaliate other than make an example of them, sending it to the decision makers. I'm never going to see that again because that's in every training film they've got for officials now when you're going to fire somebody, don't do this stupid move. Never going to see it again. So I got my one Perry Mason moment to have that. And by the way, our judge, Judge Jones, never got to see that or hear it. The first jury did. The first judge, Lassnick, did. When I asked Mr. Johnson about this email, you know, I said, I asked him all about it. And then the last question I asked him is, are you proud of that email? He said, yes. I stopped for about 30 seconds and rested. That's the kind of stuff that Judge Jones didn't get to see. He also didn't get to hear any of Mr. Rueckert's defenses to all this stuff. At best, he could read it. I wasn't even allowed to read it to him to emphasize it. And then they say witnesses, failure to call available witnesses, this is Mr. Hurlbert, the guy that's supposed to ensure uniformity, that they promised to me in a deposition, Mr. Wackerbart promised to me when I took his deposition, that he would produce him at trial, as they had in the prior trial. And they didn't. What about Mr. Crick? They produced him voluntarily in the first trial, but they wouldn't in this trial. They control all the cards, as the one case said. And when they control them, we're stuck. And that's why we need you to come up, please, come up with a definition of what should be done to test the affirmative defense, like OSHA's done in their pretext testing, as they call it. Look for shifting explanations when they realize, oh, we can't fire him for a single event, and this is a single event, because it's not in subordination and it's not gross dishonesty. And they even, when it's that clear and you see the shifting explanations, why are you going to believe these officials whose bonuses depend on how they testify? And Mr. Jones testified in this case that he has testified similarly in other cases in Federal court. The company is lost where the jury in court didn't believe him, and nobody looked in to see whether or not he told the truth or had reasons for pretext in that case. Thank you so much. Appreciate the oral argument presentations here today by you, Mr. Jungbauer and Mr. Morell. The case of Paul Parker v. VNSF Railway Company is now submitted and we are adjourned. Thank you. All rise.
judges: MURGUIA, GRABER, WARDLAW, OWENS, FORREST, SUNG, THOMAS, MENDOZA, DESAI, JOHNSTONE, ALBA